## No. 8659.

### H. J. RIVET ET AL. VS. THE CITY OF NEW ORLEANS ET AL.

The object of this suit was, in substance, to have the Ordinances of the City of New Orleans levying the 15 mills tax for the alimony of the City and the premium bonds, and levying the 16¾ mills tax for the judgments of the U. S. Courts, declared null and void ; and also, to enjoin the collection of such taxes.

The decision reasserts the constitutionality of the premium bond Act, (Act No. 31 of 1876,) as established in previous cases, and the want of foundation of the theory that, under the present Constitution, no tax exceeding ten mills on the dollar can be collected.

The nature, object and legal bearings of said premium bond Act are examined at length in the opinion of the Court.

*Held*, that the premium bond tax should be levied and collected in full, and not, as claimed by the plaintiffs, under the circumstances of the case, only in such proportion as the outstanding premium bonds bear to the whole twenty millions contemplated in the Act of 1876.

APPEAL from the Civil District Court for the Parish of Orleans. *Tissot*, J.

*B. R. Forman* for Plaintiffs and Appellants.
*T. J. Semmes & Payne* on the same side.

*C. F. Buck*, City Attorney, and *Wynne Rogers* for Defendants and Appellees.
*Miller, Finney & Miller* on the same side.

The opinion of the Court was delivered by

FENNER, J.  The plaintiffs are individual taxpayers of the City of New Orleans.

The scope of the relief sought by them in this action embraces the following objects, viz :

1.  To declare null and void the Ordinances of the City, Nos. 7531,

7532, 7535 and 7536, being respectively (No. 7531) the ordinance levying the fifteen mills tax for the alimony of the City and the premium bonds; (No. 7532) the ordinance levying 16¾ mills tax to pay judgments of United States Courts in obedience to writs of mandamus from said Courts; (No. 7535) the license ordinance, and (No. 7536) the ordinance making the estimate of liabilities and expenditures, all for the year 1882.

2.  To enjoin and prohibit the enforcement of the tax ordinances, Nos. 7531 and 7532.

3.  To enjoin the City from levying or collecting, on account of the premium bond tax, more than enough to pay the principal, interest and premiums on the drawn premium bonds of those actually outstanding, ($8,595,520,) and from levying any tax to pay any principal, interest or premiums on account of such bonds which have not been issued by the City, or, which, after issuance, have been bought, paid or otherwise extinguished.

4.  To enjoin the City from levying or collecting any tax exceeding ten mills on the dollar, and to decree that the City has no claim or privilege on the property of petitioners for any tax beyond ten mills on the dollar.

The grounds upon which this sweeping relief is asked are numerous. Many of them are too frivolous to require notice, and others may be summarily disposed of.

*First.*  So far as the tax levied under mandamus of the United States Courts, to pay judgments, is concerned, the objections thereto may be dismissed with the statement that courts of the State have no power to interfere with the Federal tribunals in the exercise of the power of enforcing their own judgments.

*Second.*  The objections to the budget are conclusively rebutted by the answer of the City and the record, showing that Act 38 of 1879 was substantially complied with.

*Third.*  The charge that the tax was illegally levied on movable property, under an assessment made thereof in 1881, instead of in 1882, in which the tax was collectible, in violation of the requirement of Articles 211 and 218 of the Constitution. need not be considered here, because, if true, it would not sustain the relief now asked.    Plaintiffs may find ample remedy in opposing this defense to the collection of any such tax on movable property belonging to them.    We say this without even suggesting an opinion as to the validity of such defense.

*Fourth.*  The claim, that under the Constitution no tax exceeding ten mills on the dollar can be collected, has been fully disposed of in the Moore, the Saloy, the DeLeon, the Ranger, and other cases.

We now approach the serious issues in the case, which are :

1.   Whether, under existing circumstances, the premium bond tax can be lawfully levied and collected.

2.   Whether the whole of that tax can be levied, or only such proportion thereof as the outstanding premium bonds bear to the whole twenty millions, the issuance of which, it is claimed, was contemplated when the tax was provided.

These questions were argued with great zeal and apparent confidence by the counsel of the plaintiffs, and we shall now proceed to dispose of the same.   As their claims are based upon the terms of the premium bond Act, we shall begin by stating and analyzing its provisions.

The Act No. 31 of 1876, commonly called the premium bond Act, was an appeal by the State, in behalf of a desperate, overtaxed and bankrupt City, to the generosity, the interest and the fears of its creditors.

The Act, in its preamble, recited that the total debt, bonded and floating, of the City, exceeded $23,000,000; that its taxable property had become so reduced in value as to require taxation of at least five per cent. per annum to meet the payments according to the terms of the Acts creating the debt; that so exorbitant a tax was impossible of collection, and would lead to a further shrinkage in assessable values, inevitably eventuating in practical bankruptcy; and that the premium bond plan, which had already been adopted by the City Council, offered an avenue of escape from impending evils.

The Act then proceeded to make the following provisions:   It approved and ratified the ordinances of the Council adopting the plan; it authorized and directed the City to exchange premium bonds for all outstanding valid bonds; it appointed a permanent syndicate of citizens to supervise and control the execution of the plan; it made it the duty of the City Council, in the annual budget adopted for each ensuing year, to include a sum sufficient to pay the drawn bonds and premiums under the plan; it imposed on the Council the further duty annually to levy a tax at a rate sufficient to provide the amount included in the budget as aforesaid, which tax after the year 1881 was to be at least one-half of one per cent.; it provided that the tax so levied should constitute a special fund to be used for no other purpose than the carrying out of the plan, and that the funds arising therefrom should be placed to the credit of a premium bond account, to be paid only on the authority of the commissioners of the consolidated debt, and that the tax should be denominated as the premium bond tax and should be separately mentioned in the tax rolls and receipts; it provided that any surplus arising above the requirements of the plan, and all drawn series and premiums falling to the City should be used in the retirement of outstanding bonds not funded into premiums.   The Act

further declared that no tax for the payment of any bonds or interest thereon, other than premium bonds, should be thereafter levied by the City of New Orleans, repealed all laws authorizing such taxation, and forbade all courts to mandamus the City to levy or collect any interest tax other than that provided by the Act.    It declared that the taxing power of the City for all purposes, including the premium bond tax, should be limited to one and one-half per centum per annum; and it declared that this limitation of the taxing power was "a contract, not only with the holder of premium bonds, but also with the taxpayers, so as to authorize any such holder or taxpayer to object to any rate of taxation in excess of the rate herein limited."    In a different section it was further provided, that "this Act in all its provisions and limitations be held a contract between the City of New Orleans, the holders of premium bonds and the taxpayers, so as to authorize any of the contracting parties to resist any increase of taxation above the rate limited therein."

The Act contained other provisions not germane to our present purpose.

It is to be borne in mind that this Act was passed soon after the initiation of the scheme and before any considerable exchange of bonds had been effected.    It was a legislative contract proposed by the State to all holders of City bonds, with the obvious purpose of inducing its acceptance by promising every advantage to those who would accept and withholding every one from those who refused.

The meaning of the Act is too clear to escape the perception of any. The State said to the holders of bonds:

"If you will exchange your bonds for premium bonds, I will impose upon the City the absolute duty of levying an annual tax of at least five mills (after 1881) to be devoted exclusively, as far as necessary, to the payment of premium bonds, in accordance with the plan; I will forbid any taxation beyond this five mills and ten mills additional for all other purposes; I will forbid the levying of any tax whatever for the payment of interest on bonds other than premium bonds; I will leave the holders of bonds who refuse my proposition no resource for payment except from the surplus of the five mills tax not required for the execution of the premium bond plan, and from the drawn series of premium bonds, and prizes which may fall to the City; and I will declare all these provisions to constitute a contract, so as to authorize the holder of premium bonds, the City, or any taxpayer to object to and resist the levying or collection of any tax other than the tax authorized by the Act."

The Act is susceptible of no other possible interpretation.    It first

provided absolutely and without qualification that the premium bond tax of at least five mills, after 1881, should, under all circumstances, be, annually levied, collected, kept apart, and devoted to the purposes prescribed ; it then said that the taxing power of the City, including the premium bond tax, should be limited to fifteen mills, which was equivalent to saying that beyond the premium bond tax the City might levy ten mills for all purposes and no more. When it authorized the premium, bondholder and the taxpayer to object to and resist any taxation "in excess of the rate herein limited," it meant any taxation additional to or other than the tax for premium bonds, and for other purposes authorized by and limited in the Act.

The pretense that the Act intended to authorize these parties to resist the levying of the premium bond tax, which, it has solemnly agreed and positively required should be levied annually, would seem to be too self-contradictory for serious consideration.

It is said that this Act is a reciprocal, synallagmatic contract. Such it clearly is. This means it is a contract in which, under the definition of the Code, " the parties expressly enter into mutual engagements," (C. C. 1765) that is to say, one party "engages to do or not to do" certain things, and in consideration thereof the other party " engages to do or not to do" certain other things. .

It becomes important, therefore, to ascertain not only what are the several engagements of such a contract, but also which party bound himself to perform the respective engagements.

Now, which party to this contract engaged that the premium bond tax should be annually levied ? Which party engaged that no tax in excess of this premium bond tax and ten mills additional should be levied ? Which party engaged that no tax for the payment of bonds or interest on bonds other than premiums should be levied ? Manifestly. these were all engagements exclusively undertaken by the State, acting for her creature, the City of New Orleans. This is apparent from the nature of the engagements, because nobody but the State or City can levy taxes or limit taxation, or refuse to levy taxes. But it is equally clear, from the language of the Act, which in the very clauses defining these engagements as a contract, adds the words: "so as to authorize the premium bondholder or any taxpayer to legally object to any rate of taxation, in excess of the rate herein stipulated," in other words, to resist any breach by the State or City of their engagements.

On the other hand, the engagements of the bondholder, when he acceded to the contract, were :

1. To exchange his bonds for premium bonds, thereby abandoning all his rights and remedies on his original bonds and substituting

therefor' the rights and remedies prescribed in the Act for his new bonds.

2. That *he* would never exact for the satisfaction of *his* bonds any tax beyond that stipulated in the Act.

So far as the taxpayer is concerned, his nomination as a party to the contract means nothing. · No provision is made for requiring or obtaining his consent, without which he could not be made a party. He is bound thereby just so far as the State, in the exercise of the law-making power, was competent to bind him and no further, and to that extent he would have been bound, had no mention been made of him, to precisely the same extent and with the same force as under the provisions referred to.

· In the Saloy case, these same taxpayers, or some of them, were before us resisting the enforcement of the premium bond tax, at a time when there was no taxation beyond the limit fixed in the Act. Would it have been an answer to their suit to say that they were *parties* to the contract and estopped from raising the defenses which we there considered and disposed of?

He is no party to the contract. He is simply subject to and entitled to all the benefit of the law. So long as this legislative contract remains *law*, and to the extent that it *is* law, he has the right to prevent the violation thereof by anybody to the injury of his rights.

The taxpayers in this case are contesting a tax levied by the City. Obviously the question is, had the City the power to levy the tax? If it had, the tax must be sustained, otherwise it must be annulled.

The questions as to the Constitutionality of Act 31 of 1876, and as to the validity of the contract sanctioned thereby, in so far as the provisions for the premium bond tax and plan are concerned, as well as the question of the duty of the City to comply with those provisions, have been finally passed upon by this Court, and we do not understand that the counsel for plaintiffs seek to agitate or reopen these issues.

Their position now is, that conceding the validity of the contract and the duty of the City to comply therewith, yet, that under the terms of the contract itself, the City is relieved from the duty of levying the premium bond tax in year 1881, for the reason that the City had been compelled by mandamus of United States Courts to levy, in that year, taxes for other purposes in excess of the limit of taxation established by that contract. The conclusive answer to this contention flows directly from the analysis we have already made of that contract and of the mutual engagements assumed by the several parties thereto.

We there showed that the obligation to limit taxation was one of several engagements undertaken by the State and City alone, in con-

-sideration of other and different engagements undertaken by the assenting bondholders.

It is not pretended that the premium bondholders have violated any of the engagements which, under our construction of the contract, were undertaken by them.   Nor is there any charge that they have, in any manner, provoked or contributed to the excessive taxation complained of.

The naked question remains, whether a party to a synallagmatic contract, who has undertaken therein to perform several engagements, can, by violating, from whatever cause, one of them, escape the obligation of, performing the others in favor of his co-contractor who has performed all of his reciprocal engagements.

Such a question can find but one answer, and that an emphatic negative.

Another conclusive ground of denying this claim of plaintiff would result from the impossibility of assuming that this Act, which positively required that the premium bond tax should be levied, and that, including the same, no tax exceeding fifteen mills should be levied, and authorizing the parties to resist any taxation in excess thereof, could possibly be construed as authorizing resistance, under any circumstances, to the premium bond tax, the levying of which it had just expressly required in the most positive terms, and which was the very gist and marrow of the entire proposition embodied in the Act and submitted to the creditors.

The taxpayers of the City of New Orleans have derived in the past, and will continue to derive immense advantages from this Act.   Under its provisions, bonds of the City to the extent of more than thirteen millions of dollars were funded into premium bonds.   The annual interest on the bonds so funded would have amounted to nearly a million of dollars annually, the payment of which would have required an annual tax nearly double that which is levied under the premium bond plan.   Even of the diminished tax so levied, more than three-fifths is returned directly to the City, to be used under the provisions of the Act, for the reduction of her bonded debt.

Such is a portion of the valuable consideration which moved from these funding bondholders to the City and the taxpayers, under this contract.

The only counter consideration which the bondholders received was the levying and appropriation of the tax provided by the Act, of which it is the object of the present suit to deprive them.

The adoption of the construction of this contract, insisted on by plaintiffs, would be to convict the State of having laid a cunning, de-

ceitful and dishonorable trap in which to catch and despoil confiding creditors.

The State submitted a proposition of settlement to the City's creditors, in which it plainly said : those of you who accept shall have a tax : those of you who refuse shall have none." Some of the creditors accepted; others refused. Now, we are told that the meaning and effect of the contract is, that those who refused shall have a tax, and those who accepted shall have none.

No court could countenance such an interpretation.

## II.

It is next contended by plaintiff that the five mills tax provided in the contract was based on the assumption that the entire twenty millions of outstanding bonds should be funded into premiums, and that, as only a portion of the same were so funded, and as the City is compelled to provide otherwise for the refunded bonds, therefore the five mills should be reduced in the proportion which the premium bonds actually outstanding bear to the contemplated twenty millions.

To this there are several answers, viz :

1. The Act itself fully contemplated the contingency that all the bonds would not be funded, and that the series of premium bonds not issued would be held and drawn for by the City, and provided that any surplus of the premium bond tax not required to carry out the plan, and also, all series and premiums drawn by the City, should be used in retiring unfunded bonds in the manner provided in the Act. There was no provision that the failure to secure the exchange of any portion of outstanding bonds should interfere with the amount of the tax or with the execution of the plan ; and we find no judicial authority to supply such a provision.

2. It would be impossible to order a reduction of the tax without requiring, at the same time, a change of the entire premium bond scheme. That scheme contemplates and authorizes no other drawing except on the original basis of the series of twenty millions of bonds ; and the tax is designed to provide for the payment of the fixed number of series and premiums drawn. Now, although only about eight millions of the bonds are held by others than the City itself, yet, since the drawing is determined by chance, it might well be that the large majority of drawn series and premiums might fall to the holders of these $8,000,000 of bonds. In such event, if the tax had been reduced, as claimed, whence would they find their payment ?

Whether the legislative power might modify the entire plan by reducing, simultaneously and in exact, equal proportion, the number of series to be drawn from, the number of series to be drawn and the

amount of prizes, and the amount of tax, might present a question worthy of consideration; but clearly, the reduction of the tax, without corresponding modification of other features of the plan, would operate a radical invasion and diminution of the bondholders' rights.

The holders of premium bonds actually outstanding have no greater advantages than they would have if every dollar of the twenty millions had been issued and remained outstanding. The City herself receives whatever portion of the tax would have gone to the holders of the bonds, now in her hands, if they had been issued.

Under the law, as it exists, the City is required to invest the part coming to her in retiring unfunded bonds. If it be desired that such portion should be applied to the payment of interest on bonds other than premiums, and thus reducing the tax necessary to pay such interest, application should be made to the legislature—certainly not to the judiciary.

It has been suggested, that because the portion of the proceeds of the premium bond tax which fell directly to the City in past years has been illegally diverted from the purposes prescribed by the law, and devoted to the retirement of premium bonds instead of other unfunded bonds, therefore the holders of premium bonds should be required to permit the whole proceeds of the tax in 1881 and subsequent years to go to the unfunded bonds until this illegal diversion has been compensated and made good. The suggestion might have some force if the holders of premium bonds were a joint stock company jointly interested in all the bonds. But when it is considered that the holders of the present outstanding bonds were in no way parties to this illegal diversion, had no interest in the bonds which have been thus retired, and have derived no advantage of any kind from the diversion, the injustice of the suggestion is at once apparent.

The Constitution of the United States extends the protection of its sheltering arms over all the valid contract creditors of the City of New Orleans.

We have swept out of the Act 31 of 1876, every provision which impaired the contracts of those bondholders who did not accept the proffered exchange.

We have adjudged its validity, in all other respects, as a contract between the State and City and the premium bondholders. We have heretofore enforced the right of the latter to the tax provided in the contract.

We find no consideration of law or justice favoring the adoption of a strained and unreasonable construction of this contract, which, while maintaining its validity and leaving the City in possession of all the enormous advantages received therefrom, would deprive the premium

Rivet et al. vs. City et al.

bondholders of every benefit solemnly promised in the Act and forming. the sole inducement and consideration for their acceptance.

, The judgment appealed from is, therefore, affirmed at appellants' cost.

### DISSENTING OPINION.

; Bermudez, C. J.   The very serious matter submitted in this case to the consideration of the Court, is the effect produced on the taxing power of the City by the limitation of one and a half per cent. contained in the premium bond Act.   As far as the five mills not necessary for the alimony are concerned, *when* creditors claiming under its provisions come in conflict with other creditors who are entitled to the exercise of the municipal power of taxation for the enforcement of their rights, growing out of anterior contracts, the obligations of which are shielded from impairment by the Federal Constitution, and *when*, the taxpayers from whom the tax is to be exacted, resist a levy, at a rate in excess of the limitation to satisfy both classes, and insist upon the observance of the limitation as a matter of *contract* in their favor, absolutely binding on the creditors composing the first class.

, The litigants are named parties to the contract: the plaintiffs, as taxpayers and residents and debtors; the City, as the mouthpiece of the creditors of both denominations.   While the plaintiffs, for their own protection against excessive taxation, necessarily champion the rights of the outstanding creditors representing the unfunded bonded City debt, the City specially advocates those of the holders of the bonds issued in 1876, under the legislative authority of that year.   As to these this Act cannot be said to be tainted with unconstitutionality, however much it may be and undoubtedly is such, as regards others, whose prior rights have been sought to be invaded and annihilated by ruthless ostracism and wanton spoliation.

.The difficulty presented consists in determining what was and is the object of the Act which imposes the limitation invoked as an inhibition against all and any taxation in excess of the rate stated; in other words, what is the meaning and purport of the limitation clause; or, practically, whether antecedent creditors, whose claims are founded on antecedent contracts, the obligations of which cannot be impaired, are entitled to exhaust, in their exclusive behalf, the exercise of the taxable power of the City of New Orleans, up to the limitation placed upon it by the premium bond Act?

, If those creditors are entitled to such preference, then the whole of the five mill tax, when raised, will have to be applied in deduction of . the 16¾ mills required to pay their judgments from the Federal Court, so that the aggregate, instead of being 31¾ mills, would be 26¾ mills

only. In that case the holders of drawn premium bonds would have to wait until after the preferred ones shall have been fully paid what may be due them. It would not be until then that the five mills would be levied for their benefit.

If those same creditors are not entitled to the preference, then the 16¾ mills and any subsequent other rate of taxation for a similar object shall have to be raised, without any aid from the fifteen mill tax, and the five mills, if not more, over and above the amount required for municipal alimony, but within the 15 mills, shall continue to be raised until the consummation of the scheme.

Into that matter shall it now be inquired.

In view of the most distressing circumstances in which the City of New Orleans was at the time involved, the municipal authorities assumed to venture in the adoption of a certain plan, in order to force a composition with the creditors whose claims were represented by bonds. Apprehending grounded resistance, these authorities procured from the General Assembly an Act ratifying their doings and expounding their scheme known as the premium bond Act. It bears No. 31 of the Acts of 1876.

The evident purpose of that " remarkable legislation " was to compel the bondholders, each and all, *nolens volens*, to fund their bonds and to receive in exchange thereof other bonds, payable at unknown and fortuitous dates, and to be known as the *premiums bonds* of the City. These were to be of the denomination of twenty dollars, dated September 1st, 1875, and to bear five per cent. interest from July 15th of that year, the interest and principal and a premium to be paid at the same time and not separately. That time was to be determined by hazard in a lottery, upon the turn of a wheel, in January, April, July and October of each year, or such other dates as the Council may prescribe and pursuant to a certain schedule.

All the unfunded, outstanding or " old " bonds were to be deemed as funded for the purposes of the Act, and the City was to hold the premium bonds representing the unfunded bonds, for which provision was to be made out of drawn bonds they held or remaining in the possession of the City; the provision being the application of such drawn bonds in kind or cash to the retirement of such unfunded, outstanding or " old " bonds.

At the end of fifty years the City was to be liberated from all bonded indebtedness.

For the purpose of providing for the payment of the drawn bonds, in principal, interest and premium, it was prescribed that a budget would be prepared and adopted, and that a tax of *five* mills only should be levied, up to the year 1881, and of *at least five* mills after that year,

provided the rate of taxation for "*every purpose of government,*" including said five mills, should *never* exceed one and a half per cent. or fifteen mills on the dollar, until the full and complete payment of said premium bonds.

Section 11, (which is to the effect that should the one-half of one per cent. tax be more than adequate to pay the drawn premium bonds, the surplus shall be used in retiring the outstanding bonds, and which declares that said one-half of one per cent. shall be considered as part of the one and a half per cent. taxation to which the taxing power of the City is limited) expressly declares that "the intention of this Section is to limit the City taxation to one and a half per cent. annually, until the entire extinction of the *bonded* debt." It does not say *funded,* but *bonded.*

To coerce submission to its terms and provisions, it was provided by Section 7 that no tax for the payment of principal or interest of other than premium bonds would thereafter be levied, and that all laws authorizing or requiring the City to pay such tax were repealed. The Section went so far as to declare that it would be incompetent for any court to issue a *mandamus* to the officers of the City to levy and collect any interest tax other than that for the premium bonds.

The 11th Section provides that the surplus, if any, realized by the annual levy of the tax to be raised in the execution of the plan, shall be distributed in retiring the outstanding bonded debt.

In the first paragraph of the preamble of the Act, the total of the City debt is stated to exceed twenty-three millions of dollars.

The Constitution, in force at the time of the passage of the Act, required the object or objects of all acts to be expressed in the title.

In the present case the title of the Act begins with the words: "*An Act to adjust, regulate and provide for the bonded debt of the City of New Orleans,*" etc.

As appears from the pamphlet in evidence in the case, the premium bond plan contemplated the funding of the entire debt of the City.

It is, therefore, manifest that the premium bond Act was designed to embrace the entire debt of the City, and that all means were resorted to in order to induce and compel the creditors of the City to accept its terms. It is also manifest that for "every purpose of government" it was agreed by a formal contract that the taxing power of the City was limited to fifteen mills, including the five mills intended for the execution of the plan, and that under no contingency would that power ever be exercised beyond that limit, until the entire extinction of the *bonded* debt of the City.

That contract must be read by the light of the Constitution of the

19

United States, which protects debts resulting from antecedent contracts against all impairment of the obligations of the same. Hence, it is, that the obnoxious 7th Section, which was levelled against all outstanding unfunded bonds owned by recalcitrant holders, has been loudly denounced by every court under whose attention it has come, and read out of the Act, as containing provisions impairing the obligations of contracts and so absolutely repugnant to the Federal Constitution.

When relieved of that offensive feature, the provisions of the Act have the complexion of a special legislation, designed to carry out the object expressed in its title, which was to adjust, regulate and provide for the entire bonded debt of the City of New Orleans, whether funded or not.

If such be, and indeed it is the case, then the five mills tax was intended for the benefit of all the bondholders of the City, whether their bonds were funded or unfunded, and was to accrue or be distributed in due proportion among the holders of both classes of municipal obligations.

The evidence in the case shows that all the outstanding or "old" bonds of the City were not funded, that of those $13,235,540 only were funded; that the five mills tax has been regularly levied and collected; that the proceeds realized have been applied to the payment of drawn premium bonds, whether owned by creditors or held by the City, representing its unfunded bonded debt; that the sums drawn by the bonds thus remaining in the possession of the City, were not at all applied to the redemption of any of the unfunded obligations, but were exclusively used for the purchase of premium bonds, so that the original amount of such bonds which had actually issued to creditors (viz: $13,235,540) was reduced to $8,599,020. By this mode obligations were taken up in *five* years which it would have required *twenty* years to retire under the mechanism of the Act. Such an operation was never contemplated. It was a flagrant injustice by which the premium bondholders cannot be permitted to be benefitted. The evil or wrong done must be repaired by all the means which the long arms of equity can successfully reach and employ.

It therefore follows that, as the five mills were to be raised for the benefit of the bonded debt of the City, however represented, and were to be apportioned accordingly, and as they were not so applied from the beginning, the holders of bonds susceptible of being drawn, under the Act, must be deprived of all participation until the proper balance or *equilibrium* has been restored.

No doubt, those creditors who accepted the terms and conditions of the Act did so, deeming they would thereby improve or better their

condition. Whether they have accomplished that result or not is a question with which this Court has no concern whatsoever.

The only question before it is, whether the plaintiffs shall pay the five mills, and whether, when paid, those five mills shall be applied to the payment of drawn premium bonds, or to the satisfaction in part of the 16¾ mills tax raised to meet the judgment creditors recognized by the U. S. Circuit Court.

The fact is glaring that there is outstanding a bonded unfunded City debt of $6,251,553, the interest on which has not been extinguished by a farthing for the last six years.

The taxpayers, plaintiffs in this case, contend, in the terms of the Act under which the premium bonds were issued, and which is a contract between them and the holders of such bonds and the City, that the intention was to limit the City taxation for " every purpose of government " to one and a half per cent. annually, until the extinction of the bonded debt of the City; and that as part of that debt is unfunded and remains still due, they cannot be required now to pay more than fifteen mills.

That position seems unanswerable by the premium bondholders, although it be no impregnable bulwark against the holders of unfunded bonds, whose rights as creditors, antecedent to the Act of 1876, are beyond the reach of that or of any subsequent legislation.

It is, therefore, considered that, while the judgment creditors are entitled to a special tax of 16¾ mills for the satisfaction of their judicially liquidated demands, based on valid anterior contracts, and while the taxing power of the City of New Orleans, under the law which confers, but restricts it, can be and must be exercised owing to existing imperious necessities, the plaintiffs should not be made to pay the 31¾ mills claimed for 1882, but only 26¾ mills altogether, out of which ten mills only are to be applied for municipal alimony and the remaining 16¾ mills to be distributed exclusively among the judgment creditors.

The Ordinances attacked impair the contract insisted upon by the plaintiffs.

The taxpayers, plaintiffs in this case, have made a last effort to resist the illegal collection from them of the entire five mills.

It is proved that the amount of premium bonds issued and held by creditors of the City is only $8,599,020; that the difference between that sum and the amount originally uttered, as well to creditors, or retained by the City, and representing the unfunded bonded debt, is considered as outstanding and that the five mills tax will continue to be levied just as though the entire unfunded bonded debt was funded and was represented by creditors holding premium bonds.

The thought is appalling that this tax will be raised annually during

thirty odd years to come for the nominal benefit of unfunded outstanding bonds, really for the advantage of funded bonds actually issued to creditors, the aggregate capital of which will however decrease annually. The use made in the past of the premium bonds drawn by the City is far from being an assurance that in the future holders of unfunded outstanding antecedent bonds will obtain any relief therefrom. The past has been and the future promises to be nothing short of a bare delusion and a crying injustice.

It is illegitimate for courts of justice, in the solemn discharge of their sacred duties, to allow themselves to be influenced in the least by the consequences which may attend their judgments. If it were legitimate to do so, a graphic, desolating picture could be drawn of the lamentable condition in which the tax-ridden community of the City of New Orleans is now to be reduced.

With the prospect of an annual tax of $650,000 for the Consolidated Bonds of 1882 and for such judgments as may have to be paid by the levy of special taxes, the quantum of taxation may probably exceed 40 mills on the dollar of taxable property in the City, a rate surely not in contemplation when the Act of 1876 was adopted.

A different construction writes out the contract from the premium bond Act and leaves the plaintiffs in a worse predicament than that in which they would find themselves had not the sanctified *law of relief* been passed, a law stigmatized by the United States Supreme Court as " *tainted with the leprosy of repudiation.*"

I, therefore, dissent from the opinion and decree.

-----

### DISSENTING OPINION.

POCHÉ, J. I cannot assent to the conclusions reached and adopted by the majority of the Court in this case.

At the time that the premium bond Act was passed, in 1876, it was announced to the world, that in view of the immense debt due by the City of New Orleans, and of the consequent depreciation of all values, the rate of taxation necessary to liquidate the debt was so exorbitant as to render the collection of the tax impossible. Hence, the scheme known as the premium bond plan was proposed by the City authorities, and was legislated into existence by the General Assembly.

I understand this Act to be what it expressly purports to be : a solemn contract between the City, the holders of premium bonds and the taxpayers or residents of said City. Its avowed object was to provide a mode of adjusting and settling the entire bonded debt of the City. The stipulation in favor of the bondholder was the agreement to levy an annual tax of five mills, to be applied exclusively to the settlement of the bonded debt, until the entire extinction thereof,

which, under the plan as detailed, was to be accomplished in fifty years.

The stipulation in favor of the taxpayer was the guarantee of a limitation of City taxation to fifteen mills for all purposes, including the tax specially set apart for the payment and settlement of the bonded debt.    The City, as the common agent of the creditor and of the debtor, was charged with the faithful execution of the contract.    As it was anticipated that some holders of City bonds would not accept the proposed settlement, and as it was forbidden in the Act to make any other proposition by taxation outside of the plan, for unfunded bonds, it was provided that any surplus which might remain of the product of this tax, after the payment of drawn premium bonds and premiums, and the amount realized from drawn premiums on bonds held for the City, should be used in retiring the outstanding bonds.    It cannot be controverted that all those stipulations and conditions were accepted by, and are in law binding on all holders of premium bonds, who are even estopped from alleging the unconstitutionality of the odious or repudiating clauses of the Act, because such clauses are favorable to them.

Under the operation of the Act, the five mill tax has been regularly collected since 1876, and the number of bonds converted into premium bonds amounts to $13,029,303; and the evidence shows that no portion of the tax thus levied has ever been applied in any manner to the benefit of the outstanding or unfunded bonds.

Some of the holders of the excluded or neglected bonds invoked the aid of the judiciary, and exposed the unconstitutional discrimination thus made and enforced against their securities.    The result of their litigation has been the annihilation as to them of the obnoxious clauses of the Act of 1876, and the immediate consequence has been a levy by various mandates of the Federal courts of a tax, independently of the fifteen mill tax, amounting to 16¾ mills.

After the adoption of the present Constitution and in obedience to its limitation to municipal taxation, the City proposed to obey its mandate, but the premium bondholder applied to the courts for the enforcement of his contract, and in the Moore case the City was coerced, and in the Saloy case the taxpayer was in his turn ruled, to the strict performance of the contract evidenced by the Act of 1876, notwithstanding the constitutional restriction interposed by the people of the State in the organic law of 1879.    The practical result to the taxpayer from all this litigation has been a tax, now enforced, up to 31¾ mills, with a very near prospect of an additional levy sufficient to make up $650,000 annually for the consolidated bondholders, under the recent decree in the Pils-

bury case, followed by another of $170,000 to meet the requirements of the Ranger case.

Feeling that the burden of taxation had almost reached the point described in the preamble of the Act of 1876; finding that the stipulations in his favor in the contract had been violated; that the amount which he had agreed to pay in fifty years was being exacted in twenty years, under the practical operation of the premium bond Act, which had been judicially consecrated as a binding obligation, the taxpayer, in his turn, invokes the aid of the judiciary for protection under the contract. This is the object of the present suit.

For obvious reasons, we are powerless to relieve him from the burden of judicial taxation imposed by the mandates of the Federal courts, whose acts are beyond our reach and control. For reasons equally potent, we are unable to relieve him of the indispensable charge of providing for the current expenses of the city government.

But on the other branch of his case we have the power, both in law and in equity, to relieve him, and, in my humble opinion, it was our bounden duty not to turn a deaf ear to his complaint.

Under the provisions of the premium bond Act, and *quoad* the holders of the premium bonds, the taxpayer of New Orleans is, in my opinion, assimilitated to an unfortunate debtor, unable to meet punctually the payment of an enormous debt. In his embarrassment he calls a meeting of his creditors, to whom he exposes his condition, and from whom he obtains an agreement postponing, on condition of stated annual or semi-annual instalments, the payment of his entire debt to fifty years. By consent the assets of the debtor are placed in the hands and under the control of a third party, who is designated as the agent of both the debtor and the creditors, and who is clothed with full power to realize the proceeds of the assets, and to make the payments under a plan adopted by all parties. In order to meet the demands of such of the creditors as could not be compelled to accept the terms of the *concursus*, the agent is instructed to set apart for them a certain portion of the proceeds annually realized from the assets of the debtor. But in the course of time the insolvent debtor discovers that a different use is being made of his resources by the agent who betrays his trust, and applies all of the debtor's resources to the payment of the claims of the contracting creditors, and that under the course pursued the latter would be paid in twenty instead of fifty years. Whereupon the deluded debtor invokes the aid of the courts for redress of his grievances.

In this case the debtor is answered by the premium bondholder, that the only part of the contract which he recognizes is that which secures him his annual five mill tax, but that he has no concern with and that

he is not bound by any other condition or stipulation.  The taxpayer awaits the decision of the court, and then he is answered and informed that he was not a necessary party to the contract in which his name was included as a mere superfluity; and that the premium bondholder, who thus acquires a chance of being paid in full in twenty years, when the respite which was granted by the Act was intended for fifty years, is not benefitted by the unauthorized and unforeseen mode of executing the plan.

With all due deference to my associates, I cannot join them in such an answer.

To the argument made by counsel that a different answer from this Court would destroy values recognized by the courts, would shake confidence in securities well established as commercial commodities, and would disturb the equanimity of commerce, I reply, that I see on the other hand an impoverished, tax-ridden and overburdened people, willing to meet their obligations within the time agreed upon, and demanding nothing more than the legal enforcement of the contract in its entirety.

I, therefore, dissent from the opinion and decree in the case, for the foregoing reasons, which I hastily sketched in the short time between the adoption and the announcement of the opinion.